IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PAUL E. PODHORN,

   Petitioner,

 v.

J. GRONDOLSKY,

   Respondent.

Civil Action No. 09-3588 (JBS)

**MEMORANDUM OPINION**

SIMANDLE, District Judge:

  1. On May 27, 2009, the Clerk received a § 2241 petition from Paul E. Podhorn ("Petitioner"). See Podhorn v. Grondolsky, 09-2531 (JBS), Docket Entry No. 1. The petition raised numerous Bivens challenges, speculative habeas claims and stated demands for release from confinement on the grounds of Petitioner's belief that he was entitled to clemency. See id.

  2. On June 12, 2009, this Court issued an order ("June Order") in Podhorn v. Grondolsky, 09-2531, dismissing the petition; the order was accompanied by a detailed opinion ("June Opinion"). Specifically, in its June Opinion, the Court explained to Petitioner that Petitioner's Bivens challenges could be raised only in a civil complaint. The Court also explained to Petitioner that Petitioner's Bivens challenges are already raised by Petitioner in another civil action, based on the civil complaint pending before Judge Hillman. In addition, the Court

clarified to Petitioner that Petitioner could not obtain clemency by raising habeas challenges.  Finally, the Court explained to Petitioner the invalidity of his speculative habeas claims and detailed to him the process of administrative exhaustion.

     3.   On June 23, 2009, the Clerk docketed in Podhorn v. Grondolsky, 09-2531, an order entered in Podhorn v. Grondolsky, 09-1210 (RMB), where Judge Bumb traced procedural and substantive developments in all then-existing Petitioner's actions in this District, including Podhorn v. Grondolsky, 09-2531.[1]

     4.   On June 30, 2009, the Clerk docketed Petitioner's original motion for reconsideration of this Court's June Order (issued by this Court in Podhorn v. Grondolsky, 09-2531 (JBS)).  On July 8, 2009, this Court issued an order in Podhorn v. Grondolsky, 09-2531, which denied Petitioner's original motion for reconsideration on the grounds that the motion either reiterated Petitioner's challenges already disposed of in this Court's June Order and June Opinion or outlined Petitioner's emotions irrelevant to the substance of his claims.  In the Court pointed out to Petitioner that Petitioner's assertions as to the issue of administrative exhaustion were without merit.

     5.   However, the Court also stated as follows:

---

[1] Since the time of Judge Bumb's review and summary conducted in Podhorn v. Grondolsky, 09-1210 (RMB), this Court has initiated the instant matter for Petitioner and, in addition, Petitioner, on his own, has initiated another habeas action, namely, Podhorn v. Grondolsky, 09-3395 (NLH).

> [I]n the event Petitioner: (a) obtains a formal response from his warden indicating that Petitioner should not be released in the nearest future, but, at the same time, (b) Petitioner is of opinion that the sentence imposed upon him is about to expire in the nearest future, Petitioner may be excused from further exhaustion of this claim in light of potential exigency of such circumstances, i.e., in light of the possibility that Petitioner might be held in confinement in excess of the sentenced imposed upon him.

Id. at 3.

6. On July 16, 2009, the Clerk docketed Petitioner's second motion for re-reconsideration in Podhorn v. Grondolsky, 09-2531 (JBS). That second motion: (a) asserted that Petitioner was being denied transfer to community correctional center ("CCC"); (b) alleged that Petitioner's release date should be August 5, 2009, rather than a later date of which Petitioner had been, apparently, informed; and (c) concedes that Petitioner raised these challenges only with the warden at his place of confinement. This second motion also asserted that exhaustion with the Regional and Central Offices of the Bureau of Prisons ("BOP") would be futile, and sought excuse from the exhaustion requirement on the grounds that the warden did not respond to Petitioner's grievance. In addition, the second motion recited Petitioner's Bivens challenges.

7. On July 20, 2009, this Court issued an order addressing Petitioner's second motion for reconsideration. See Instant

Matter, Docket Entry No. 2 (also docketed in issued by this Court in Podhorn v. Grondolsky, 09-2531 (JBS)).  In that decision, the Court explained to Petitioner, again, that Petitioner's Bivens challenges cannot be litigated in a habeas action, and that his Bivens challenges are already pending before Judge Hillman in Podhorn v. Grondolsky, 09-2611 (NLH), i.e., in the matter, which is in administrative termination due to Petitioner's failure to prepay his filing fee or to submit his in forma pauperis application, and which Petitioner could reopen in the event he duly prepaid his filing fee or applied for in forma pauperis status. In addition, the Court explained to Petitioner that his habeas challenges raised in the second motion, namely, challenges to non-transfer to a CCC and to allegedly wrongful calculation of Petitioner's sentence, were qualitatively different from Petitioner's original challenges raised in Podhorn v. Grondolsky, 09-2531 (JBS), i.e., from Petitioner's requests for clemency release and his speculative habeas claims.  Thus, this Court concluded that Petitioner's habeas challenges raised in his second motion could not be entertained in Podhorn v. Grondolsky, 09-2531 (JBS).  Moreover, the Court held that the fact that Petitioner did not receive a response from his warden could not render the exhaustion requirement futile.  However, in light of Petitioner's allegations that his correct release date should be August 5, 2009 (i.e., that he should be released in about two

weeks from the date of entry of the Court's order as to Petitioner's second motion for reconsideration), this Court found that Petitioner's release-date-related challenges and Second-Chance-Act-related challenges were sufficiently exigent to excuse the exhaustion requirement.  The Court, therefore, construed Petitioner's second motion for reconsideration as a new and separate habeas petition, initiated the instant habeas matter on the grounds of this second-motion-transformed-into-petition, and granted Petitioner emergent in forma pauperis status in order to entertain these new challenges on expedited basis.  Moreover, the Court granted Respondent only ten days from the date of entry of the Court's order to file Respondent's answer to Petitioner's duration-of-confinement and Second-Chance-Act challenges.  See Instant Matter, Docket Entry No. 2.  The Court docketed the Court's order on July 22, 2009.  See id.

    8.   On July 31, 2009, Respondent filed his response.[2] Composed of a memorandum answer and two sets of declarations, each accompanied by corresponding sets of exhibits, the substance of the response could be summarized as follows:

    a.   Respondent maintains that Petitioner's challenges to the duration of his confinement are without merit since the period equal to Petitioner's sentence (i.e., the

---

[2] The Court takes this opportunity to note Respondent's commendable speed of response and -- especially -- outstanding quality of Respondent's submission by AUSA Mark C. Orlowski.

period of incarceration to which Petitioner was re-sentenced) reduced by his prior custody credit, and further reduced by the particular "good conduct" credit applicable to Petitioner, yields December 16, 2009, as Petitioner's projected release date.  Respondent's argument and detailed calculation demonstrate that Petitioner's mode of calculation is erroneous because : (i) Petitioner initially utilizes, without any legal basis, a wrong algorithm to calculate the period of the "good conduct" credit applicable to the prison term to which Petitioner was re-sentenced; and, then, (ii) Petitioner amplifies the error in his calculation by utilizing the "good conduct" period without factoring in the reductions of this "good conduct" credit ensuing from Petitioner's disciplinary violations.[3]
<u>See</u> Instant Matter, Docket Entry No. 6, at 9-12 (setting forth the calculation mode used by the BOP, the figures factored in the BOP's algorithm, the legal basis for such calculation and the declaration and

---

[3] The Court notes, in passing, that -- in the event Petitioner wishes to challenge the reduction of his "good conduct" credit, petitioner shall challenge each such decision by his prison officials in a new and separate habeas matter *after duly exhausting his administrative remedies at all three levels of the BOP* with respect to each such administrative decision.

      exhibits upon which Respondent relies to determine the applicable figures).

b. Respondent also maintains that Petitioner's challenges to the BOP's alleged failure to consider him for transfer to a CCC are equally without merit.  According to the evidence produced by Respondent, the chain of events was as follows: (i) Petitioner, being initially sentenced by the Southern District of Illinois to 87 months of imprisonment for various offenses related to sale of stolen fireams and sale of firearms without maintaining proper record, appealed his sentence to the United States Court of Appeals for the Seventh Circuit; (ii) upon the Seventh Circuit's finding that Petitioner's sentence was unduly enhanced, his case was remanded to the Southern District of Illinois, causing the district court to remove the enhancement, which resulted in reduction of Petitioner's sentence from 87 to 70 months; (iii) since Petitioner became eligible for consideration for CCC placement on the date when his sentence was reduced to 70 months, the BOP was willing to consider him for such placement immediately; (iv) however, when the Southern District of Illinois reduced Petitioner's sentence to 70 months, Petitioner had his request (seeking to change his supervised

release from the Eastern District of Illinois to the Eastern District of Missouri) pending with probation officials and, thus, pursuant to BOP policy, the fact of Petitioner's request halted the BOP's consideration of Petitioner for CCC placement until Petitioner's relocation to Missouri was confirmed; (v) on June 17, 2009, that is, when Petitioner's relocation to Missouri was rejected by probation officials (on the grounds that Petitioner's wife informed probation officials that she was relocating to the part of Florida corresponding to the Southern District of Florida), Petitioner became eligible, under the BOP policy, for consideration for CCC placement, but -- just nine days later, i.e., on June 26, 2009 -- Petitioner re-halted the process, again, by filing a request seeking transfer of his supervised release to the Southern District of Florida;[4] (vi) at the instant juncture, the BOP is yet to get any response from the Southern District of Florida probation officials and, thus, the process of the BOP consideration of Petitioner for CCC placement is still halted.  See id. at 7-9,  12-18.

---

[4] That request acknowledged Petitioner's understanding that he would be considered for CCC placement only *after* the Southern District of Florida probation officials render their decision as to Petitioner's request for transfer of supervised release.

9. This Court agrees with Respondent's calculation of Petitioner's sentence. The evidentiary, legal and mathematical bases of Respondent's calculation are well set forth in Respondent's reply, see Docket Entries Nos. 6 and 6-2, No purpose is served to repeat here what has already been stated with utmost clarity. The Court, therefore, will deny Petitioner a writ as to the issue of duration of Petitioner's sentence.

10. Similarly, the Court is convinced by Respondent's argument that Respondent did not act unreasonably by delaying consideration of Petitioner for CCC placement. As with the above-discussed date-of-release challenge, this Court sees little sense in reciting Respondent's legal argument and evidentiary bases, as they could be easily determined from the content of Docket Entries Nos. 6 and 6-3. However, one point made by Respondent deserves to be stressed, and two additional points, omitted by Respondent, warrant notice.

> (i) Specifically, Respondent correctly observes that:
>
> 18 U.S.C. § 3621(b) (as amended by the Second Chance Act of 2007, Pub. L. No. 110-199, April 9, 2008) provides:
>
>> (b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment . . . within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-
>>
>>> (1) the resources of the facility contemplated; . . .

9

> (3) the history and characteristics of
>     the prisoner . . . and
> (5) any pertinent policy statement
>     issued . . .
>
> [P]art of the purpose behind the Second
> Chance Act is that the BOP "afford th[e]
> prisoner a reasonable opportunity to adjust
> to and prepare for the reentry of th[e]
> prisoner into the community." See 18 U.S.C. §
> 3624(c)(1) (as amended by the Second Chance
> Act of 2007, Pub. L. No. 110-199, April 9,
> 2008).  In order to prepare an inmate for
> successful reintegration into the community,
> the BOP, in conjunction with the [probation
> officials], must necessarily determine first
> to which community the inmate will be
> released.  It would not be practical to place
> an inmate in a [CCC] for the purpose of
> establishing ties to a community and
> obtaining employment in an area different
> from where he is to be released.  Moreover,
> it would not make sense for the BOP to
> evaluate the time period for Petitioner to
> spend in a RRC until the supervised release
> region is determined, because the time period
> required to generate the greatest likelihood
> of successful reintegration into the
> community for Petitioner may vary by region
> and Petitioner's pre-existing ties, if any,
> to that particular community. Accordingly,
> in order to properly evaluate the Petitioner
> for placement in a specific [CCC], the BOP
> needs to know where Petitioner will be
> serving his supervised release.
> Consequently, the BOP requires that
> [probation officials] approval accompany any
> [CCC] referral request.  The BOP will not
> have that information until the [probation
> officials] approval for transfer of
> Petitioner's supervised release is received.

Docket Entry No. 6, at 17-18 and n. 2 (citations to declarations and exhibits omitted).

The Court agrees. Indeed, the goal of the Second Chance Act is a meaningful -- rather than a checkmark -- reintegration of inmates in the community, including a meaningful opportunity to establish ties to the particular community and to obtain employment in the geographic area of release. Hence, under the holding of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Court finds the BOP policy reasonable.[5]

---

[5] First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).

Even where the agency construction appears in an "interpretive" rule not subject to the "notice-and-comment" procedure of the Administrative Procedure Act, the agency's interpretive rule is entitled to deference where it is a permissible construction of the governing statute. See Reno v. Koray, 515 U.S. 50, 61 (1995). In light of the foregoing, the BOP policy tying the decision of probation officials (as to the actual locale of the anticipated supervised release) to the BOP's consideration of the prisoner for CCC placement appears utterly reasonable and indeed a permissible construction of the Second Chance Act.

(ii) Moreover, the Court's review of the circumstances at bar reveals no BOP deviation from either the letter and the spirit of the Second Chance Act. Indeed, the BOP had no means to envision that Petitioner might succeed on his appeal to the Seventh Circuit, same as the BOP had no means to determine when the Southern District of Illinois might re-sentence Petitioner or what would be Petitioner's term of imprisonment upon re-sentencing. Simply put, the agency could not -- and had no obligation to -- be a clairvoyant. Therefore, it would be wholly unreasonable to charge the BOP with failure to deal with Petitioner's sudden eligibility for CCC placement in advance where the BOP had no notice that such situation might develop.

(iii) Finally, it appears wholly anomalous to blame the BOP for the decisions made by Petitioner. Indeed, it was Petitioner's decision to request transfer of his supervised release first from the Eastern District of Illinois to the Eastern District of Missouri, and then from the Eastern District of Illinois to the Southern District of Florida, that halted, several times, the process of the BOP consideration of his CCC placements. As the courts frequently observed, albeit in other circumstances, "the law does not save a litigant who [first halts the administrative process] and then tries to capitalize on the [fact of the administrative process is in halt]. The reason is self-evident: the [litigant] cannot convincingly argue that

12

[the agency failed to act, as time passed by,] if the [litigant] controls the clock." Pelich v. INS, 329 F.3d 1057, 1060 (9th Cir. 2003) (applying the concept to different type of § 2241 habeas challenge); see also Singh v. Cicchi, 2008 U.S. Dist. LEXIS 55661, at *18 (D.N.J. July 15, 2008) (same); Phillip v. McKenzie, 2008 U.S. Dist. LEXIS 21037, at *11 (D.N.J. Mar. 18, 2008) (same); Martinez v. Gonzales, 504 F. Supp. 2d 887, 898 (C.D. Cal. 2007) (same); accord In re Fleetboston Fin. Corp. Secs. Litig., 253 F.R.D. 315, 339 (D.N.J. 2008) (applying the same concept to another form of federal litigation).  If the BOP is unable to meaningfully address the issue of Petitioner's potential CCC placement in a speedier way because Petitioner keeps requesting transfers of his supervise release to another -- and then yet another -- part of the United States, the delay Petitioner allegedly suffers is of his own making.

11. The Court, therefore, will deny Petitioner a writ as to the issue of the BOP consideration of Petitioner for CCC placement.  This denial, however, is without prejudice to Petitioner's renewal of these challenges if, but only if: (a) the BOP fails to consider Petitioner for CCC placements within reasonable time after the BOP receives a determination by probation officials as to an acceptable place of Petitioner's

13

supervised release;[6] and (b) Petitioner either duly exhausts these challenges at all three levels of the BOP or demonstrates a bona fide effort to obtain administrative exhaustion through filing, *at the very least,* (i) an informal grievance, and then (ii) a formal application to his warden.

    12. The accompanying Order will be entered.

**August 4, 2009**                          **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                            U.S. District Judge

---

[6] The Court stresses that the inability of the BOP to consider Petitioner for CCC placement within a week or two from the date of determination of Petitioner's place of supervised release cannot qualify as the BOP's failure to act within a reasonable period of time. The Court, however, does not express any opinion as to what period of time qualifies as "unreasonable," since such inquiry is, by definition, could be conducted only on a case-by-case basis.